# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2020

Lyle W. Cayce
Clerk

No. 20-20147

United States of America,

*Plaintiff—Appellant*,

*versus*

Wilmar Rene Duran-Gomez, *also known as* El Gordo, *also known as* Junior, *also known as* Oscar, *also known as* Carnalito,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:10-CR-459-1

Before Barksdale, Elrod, and Ho, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

In July 2010, Wilmar Duran-Gomez was indicted on capital charges stemming from a 2006 double homicide in southern Texas. Over the subsequent years, Duran-Gomez moved to continue his trial on numerous occasions and never objected to his co-defendants' or the government's requests for delay—until August 2019, when he claimed that his Sixth Amendment right to a speedy trial had been violated. The district court agreed, dismissed all charges with prejudice, and ordered Duran-Gomez released.

No. 20-20147

Our court granted the government's emergency motion to stay the district court's order and expedited this appeal. Under the Supreme Court's balancing test in *Barker v. Wingo*, 407 U.S. 514 (1972), we conclude that Duran-Gomez's speedy trial right was not violated and therefore REVERSE and REMAND the case for a prompt trial.

I.

In November 2006,[1] Wilmar Duran-Gomez illegally smuggled aliens into the United States. Two Honduran men attempted to escape the warehouse where Duran-Gomez was holding them until he received their smuggling fees. As punishment, Duran-Gomez beat and tortured the men over the course of a week. Duran-Gomez also sodomized one of the men with several objects and directed someone to set the man on fire.

On November 14, 2006, the two men—Abelardo Sagastume and Hector (last name unknown)[2]—succumbed to their injuries and died. Duran-Gomez put their bodies in the back of a pickup truck and drove to a field in south Texas, where he unsuccessfully attempted to burn the truck with the bodies inside. He then fled the scene.

Sheriff's deputies discovered the bodies the following morning. A few days later, a confidential informant told Immigration and Customs Enforcement ("ICE") that Duran-Gomez directed an international alien-smuggling operation and that he had recently killed two smuggled aliens. ICE soon learned that, after entering the United States with a visa, Duran-Gomez

---

[1] We recount the factual history of the underlying crimes as it is alleged in various records submitted on appeal, including the indictments and the death-penalty recommendation materials submitted to the Attorney General of the United States.

[2] We refer to him as Hector herein because his last name is unknown.

committed two crimes involving moral turpitude—rendering his presence in the United States unlawful.[3]  On November 21, 2006, Duran-Gomez was arrested for civil immigration violations.

A few days later, Duran-Gomez called his family from the immigration detention center and asked them to destroy evidence of his smuggling scheme.  He was subsequently charged with obstruction of justice, to which he pleaded guilty in May 2007.  In January 2011, he was sentenced to 60 months of imprisonment for that crime.  Meanwhile, law enforcement officials continued the homicide and smuggling investigations.

On July 1, 2010, the government indicted Duran-Gomez and several co-defendants with conspiring to smuggle aliens into the United States and harboring aliens resulting in the deaths of Abelardo and Hector.  On January 10, 2017, Duran-Gomez and a co-defendant, Efrain Rodriguez-Mendoza, were charged in a superseding indictment with the additional counts of kidnapping and hostage-taking resulting in the deaths of the two men.[4]

After a lengthy review process, the government informed Duran-Gomez that it would seek his death.  Rodriguez-Mendoza was a fugitive at the time of the 2010 indictment and was not arrested until April of 2013.

---

[3] Duran-Gomez's two previous convictions involving crimes of moral turpitude are a 1994 misdemeanor shoplifting conviction and a 2002 felony conviction of aggravated assault with a deadly weapon in which he beat, threatened with a knife, and later raped the victim.

[4] First, Duran-Gomez is accused of conspiring to smuggle aliens into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I).  Second, he is accused of harboring aliens resulting in the deaths of Abelardo and Hector in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(B)(i), 1324(a)(1)(A)(v)(II), and 1324 (a)(1)(B)(iv). Third, he is accused of kidnapping resulting in the deaths of Abelardo and Hector in violation of 18 U.S.C. § 1201(a)(1).  Finally, he is accused of taking Abelardo and Hector hostage, resulting in their deaths, in violation of 18 U.S.C. § 1203.

No. 20-20147

After capturing Rodriguez-Mendoza, the government initiated the death penalty review process, but it was protracted at least in part by Rodriguez-Mendoza's attempts to dissuade the government from seeking his death based on an alleged intellectual disability. In February 2017, the government filed its Notice of Intent to seek Rodriguez-Mendoza's death.

From when Duran-Gomez was indicted in July 2010 to when he moved to dismiss for speedy trial violations in August 2019, he either moved or joined his co-defendants in moving for continuances on seventeen different occasions:

(1)     On July 29, 2010, a co-defendant moved to continue the trial. Duran-Gomez was unopposed to the motion.

(2)     On November 15, 2010, a co-defendant moved to continue the trial. Duran-Gomez was unopposed to the motion.

(3)     On March 22, 2011, Duran-Gomez moved to extend the pre-trial motions deadline.

(4)     On March 29, 2011, a co-defendant moved to continue the trial. Duran-Gomez was unopposed to the motion.

(5)     On August 3, 2011, the district court granted a co-defendant's motion to continue the trial. Duran-Gomez was unopposed to the motion.

(6)     On November 7, 2011, Duran-Gomez moved to extend the pre-trial motions deadline.

(7)     On November 22, 2011, a co-defendant moved to continue the trial. Duran-Gomez was unopposed to the motion.

(8)    On January 17, 2012, the district court granted a co-defendant's motion to continue the trial. Duran-Gomez was unopposed to the motion.

(9)    On February 21, 2012, a co-defendant moved to continue the trial. Duran-Gomez was unopposed to the motion.

(10)    On October 10, 2012, Duran-Gomez moved to continue the trial.

(11)    On March 18, 2013, Duran-Gomez moved to continue the trial.

(12)    On October 31, 2013, Duran-Gomez moved to continue the trial.

(13)    On February 20, 2015, Duran-Gomez moved to continue the trial.

(14)    On January 19, 2016, Duran-Gomez moved to continue the trial.

(15)    On September 7, 2016, Duran-Gomez moved to continue the trial.

(16)    On May 30, 2017, Duran-Gomez moved to continue a pre-trial motion deadline.

(17)    On February 4, 2019, Duran-Gomez moved to continue pre-trial motion deadlines.

In September 2018, Rodriguez-Mendoza filed a motion to sever his trial from Duran-Gomez's trial, which the government opposed. Two months later, two Federal Public Defenders from the District of Maryland

joined Duran-Gomez's defense team[5] and subsequently moved on February 8, 2019 to sever his trial from Rodriguez-Mendoza's trial. On March 18, 2019, the district court granted Rodriguez-Mendoza's motion to sever, thereby mooting Duran-Gomez's motion.

The government and Duran-Gomez's defense team met in early May 2019 to discuss trial preparation and deadlines. Duran-Gomez's counsel suggested continuing the trial to January 2022, but the government expressed a desire to have the trial in 2021. The district court later adopted the parties' joint proposed schedule, setting trial for March 8, 2021.

But it was not to be. Just a few months later, on August 26, 2019, Duran-Gomez moved to dismiss all charges against him for purported violations of his Sixth Amendment right to a speedy trial—the first time he had ever raised the issue. After the district court received written memoranda and held a hearing on the motion, it dismissed all charges with prejudice on March 12, 2020 and ordered Duran-Gomez released. Finding that Duran-Gomez's speedy trial right attached in 2006, the district court held that Duran-Gomez had been severely prejudiced by the delay, warranting dismissal of all charges against him. The government timely appealed and filed an emergency motion in this court, requesting a stay of the district court's dismissal and release orders. Our court granted the government's motion and expedited this appeal, and we heard oral argument on September 15, 2020.

---

[5] Before the Public Defenders joined his defense team, Duran-Gomez was represented by Wendell Odom, Jr. and Neal Davis, III. They still represent Duran-Gomez, along with the Public Defenders, except that Mr. Odom did not join in Duran-Gomez's brief on appeal.

No. 20-20147

II.

We review *de novo* a district court's application of the *Barker* factors. *United States v. Molina-Solorio*, 577 F.3d 300, 304 (5th Cir. 2009). A district court's factual determinations regarding the speedy trial right are reviewed for clear error. *United States v. Frye*, 372 F.3d 729, 735 (5th Cir. 2004). Clear error exists only when we have "a definite and firm conviction that a mistake has been committed." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010).

III.

The Sixth Amendment to the U.S. Constitution provides that "the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. While "the ordinary procedures for criminal prosecution are designed to move at a deliberate pace," the "right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances." *United States v. Ewell*, 383 U.S. 116, 120 (1966) (quoting *Beavers v. Haubert*, 198 U.S. 77, 87 (1905)). To determine whether the speedy trial right has been violated, we balance *Barker*'s four factors: (1) length of delay, (2) reason for delay, (3) the defendant's diligence in asserting the right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530; *see also Molina-Solorio*, 577 F.3d at 304.

A.

*Barker*'s first factor, length of delay, functions as a triggering mechanism. *Barker*, 407 U.S. at 530. In our circuit, we examine the remaining three factors if the trial has been delayed for at least one year. *Goodrum v. Quarterman*, 547 F.3d 249, 257–58 (5th Cir. 2008).[6] Here, the

---

[6] In *Barker*, the Supreme Court alternatively described the "triggering mechanism" as when the delay has become "presumptively prejudicial." 407 U.S. at 530. The "prejudice" that triggers analysis of the remaining three *Barker* factors is distinct from

7

No. 20-20147

parties agree that full *Barker* analysis is triggered, but they disagree as to the precise amount of delay.[7]

Because Duran-Gomez's speedy trial right attached no later than 2010, the delay (from indictment to dismissal) is, at the very least, greater than nine years.[8] This factor weighs heavily against the government. *Molina-Solorio*, 577 F.3d at 305 (holding that a delay of "nearly ten years" heavily favored the defendant).

### B.

We now turn to the second factor, the reason for delay, and ask "whether the government or the criminal defendant is more to blame." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009) (quoting *Doggett v. United States*, 505 U.S. 647, 651 (1992)). Not all reasons for delay are assigned equal weight:

---

prejudice suffered by the defendant, which is the fourth *Barker* factor. *Id.* at 532. *See also Goodrum*, 547 F.3d at 257–58, 260.

[7] The district court held that the speedy trial right attached at Duran-Gomez's December 2006 arrest for administrative immigration violations. The government contends that the right did not attach until July 1, 2010, at the earliest, when Duran-Gomez was indicted for conspiring to smuggle aliens and for harboring aliens resulting in death. *See Cowart v. Hargett*, 16 F.3d 642, 645–46 (5th Cir. 1994) (holding that a defendant's speedy trial right attaches only when he is "formally charged with a crime or actually restrained in connection with that crime.") (quoting *Dickerson v. Guste*, 932 F.2d 1142, 1144 (5th Cir. 1991)). We need not decide this issue because the length of delay in either instance far exceeds the one-year threshold required to trigger an analysis of the remaining *Barker* factors.

[8] The government invites us to extend *Cowart* by holding that the speedy trial right is charge-specific, such that the speedy trial "clock" begins anew with respect to additional counts charged in superseding indictments. We need not address this issue, for our conclusion is the same regardless of whether Duran-Gomez's speedy trial right attached in 2010 (the original indictment) with respect to all counts or whether the right attached as to some counts in 2010 and as to others in 2017 (the second superseding indictment).

> At one extreme, a deliberate delay to disadvantage the defense is weighted heavily against the [government]. At the other end of the spectrum, delays explained by valid reasons or attributable to the conduct of the defendant weigh in favor of the [government]. Between these extremes fall unexplained or negligent delays, which weigh against the [government], but not heavily.

*Goodrum*, 547 F.3d at 258 (quoting *Cowart*, 16 F.3d at 647) (internal citations omitted).

A defendant can likewise contribute to delay by, for example, asking for continuances. Importantly, if he later claims a speedy trial violation, he "will not be heard to complain of a lapse of time attributable to continuances he sought and received from the trial court." *Nelson v. Hargett*, 989 F.2d 847, 852 (5th Cir. 1993); *see also Robinson v. Whitley*, 2 F.3d 562, 569 (5th Cir. 1993) (weighing against a defendant his own motions for continuance). Sometimes, delay works to the defendant's advantage, as when witnesses "become unavailable or their memories . . . fade." *Barker*, 407 U.S. at 521. Because "it is the prosecution which carries the burden of proof[,]" a delay may mean that "its case will be weakened, sometimes seriously so." *Id.* Indeed, "[d]elay is not an uncommon defense tactic." *Id.*; *see also Brillon*, 556 U.S. at 90 (recognizing "the reality that defendants may have incentives to employ delay as a 'defense tactic'") (quoting *Barker*, 407 U.S. at 521).

Since his original indictment in 2010, Duran-Gomez moved to continue his trial or various deadlines on ten different occasions. His counsel certified that he was unopposed to seven of his co-defendants' motions for continuance, bringing the total continuances to which he either sought or explicitly consented to seventeen. On appeal, Duran-Gomez nevertheless argues that his motions for continuance should weigh against the government because, he says, the government's negligence forced him to seek continuances. For example, Duran-Gomez argues that the continuances he

sought during Rodriguez-Mendoza's death-penalty review process should not be weighed against him because in those motions he said that Rodriguez-Mendoza was "material to Duran's defense—whether [Rodriguez-Mendoza] is a trial co-defendant or one who will testify against Duran."

But Rodriguez-Mendoza's importance was not the only reason Duran-Gomez asked to continue the trial. In all ten of his motions for continuance, including the ones made during Rodriguez-Mendoza's death-penalty review process, Duran-Gomez stressed his own counsel's independent need for delay. For example, he noted in one of the motions he made during Rodriguez-Mendoza's review process: "[C]ounsel would request . . . more time to continue the discovery and investigation into the matters in this case as well as develop the necessary mitigation issues for punishment in this death penalty case." In several other motions he filed while awaiting the Rodriguez-Mendoza decision, Duran-Gomez noted that "[d]efense counsel is still in the process of contacting witnesses, engaging experts, conducting a separate investigation, developing mitigation and wrestling with budget constraints and requests." By Duran-Gomez's own admission, therefore, he sought these continuances to satisfy his own investigative and preparatory needs.

Duran-Gomez urges us to weigh against the government the entire four years it took to complete Rodriguez-Mendoza's death-penalty review process. We note again that Rodriguez-Mendoza's process was protracted at least in part by his assertion of an intellectual disability and the extensive testing required to examine such a claim. One of the reasons the speedy trial right "depends upon [the] circumstances" of the individual case is that "many procedural safeguards are provided an accused." *Ewell*, 383 U.S. at 120 (quoting *Beavers*, 198 U.S. at 87).

No. 20-20147

Deciding whether it should seek the death penalty for a defendant is one of the government's gravest responsibilities. When a defendant alleges that he has a condition which would make his death at the government's hand unconstitutional, this task becomes even weightier. The path to decision should be proportionately ruminative. "Death . . . differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Courts have recognized that a "requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *Ewell*, 383 U.S. at 120. "[B]oth defendants and the public have an interest in a system that is fair and reliable, which must often come at the expense of haste." *United States v. Ghailani*, 733 F.3d 29, 41–42 (2d Cir. 2013). These principles of justice apply to Duran-Gomez's death-penalty review process just as they do to Rodriguez-Mendoza's.

Duran-Gomez also says that he was forced to wait until the end of Rodriguez-Mendoza's process because the government chose to "tether" their trials by charging them as co-defendants. Nothing prevented Duran-Gomez from asserting his right to a speedy trial, and nothing kept him from attempting to effectuate that right by moving to sever from Rodriguez-Mendoza, something he did not do until February 2019. The district court signaled at several status conferences that it would entertain severance motions because of how long the case had lasted, and Duran-Gomez never took the opportunity. Duran-Gomez made a calculated decision to wait until the government decided whether it would seek Rodriguez-Mendoza's death, apparently because he thought the decision would play a "material" role in

11

his trial strategy. Plus, the delay allowed Duran-Gomez to pursue a plea deal, something his lawyers called "the best chance of saving [his] life."

Another of Duran-Gomez's arguments is based on what he says was the government's negligent discovery methods in this case. Federal Rule of Criminal Procedure 16 requires the government to "make available for inspection, copying, or photographing" certain discovery materials, such as test results and the defendant's written or recorded statements. *See* Fed. R. Crim. P. 16(a)(1)(A)–(B), (D)–(F). Other prosecutorial materials are not subject to discovery at all. *See id.* 16(a)(2).

From the inception of this case until early 2017, the government operated under Rule 16 with what is called an "open file" policy and announced at two status conferences—one in October 2012 and another in February 2014—that this was an "open file" case. Under this policy, various documents and discovery materials were available for "inspection, copying, or photographing" (per Rule 16) at the U.S. Attorney's Office. Oral argument at 23:08-24:17. Once in April 2011 and once in January 2012, a paralegal at the U.S. Attorney's Office e-mailed Duran-Gomez's counsel to let them know that some CDs with discovery material on them were "available for pick-up at the U.S. Attorney's Office."

In addition to having discovery available under the open file policy, the government proactively turned over discovery to Duran-Gomez's counsel on two occasions. It turned over about 8,000 pages of discovery in November 2010. Then, in 2017, after a new prosecutor joined the case team, she rescanned and added Bates stamps to all discovery materials for release to Duran-Gomez's counsel. These discovery materials totaled approximately 65,000 pages.

The new prosecutor then loaded the documents onto a flash drive and a CD and gave them to Duran-Gomez's counsel on January 31, 2017.

Included in these materials were several documents that the government was not required to disclose under Rule 16, but nevertheless could prove helpful to Duran-Gomez.  Of the 65,000 pages, the parties were unable to definitively say which pages had already been turned over to defense counsel in the November 2010 disclosure, which pages had been included on the discovery CDs that were turned over in 2011 and 2012, which pages had already been seen by defense counsel under the open file policy, or which pages were made available for the first time in 2017.  Oral Argument at 24:20-24:40.  Thus, the government said at a later status conference that the prosecutor did these things out of "an abundance of caution, [copying] everything that was in the office . . . that was already in the case file and available for inspection to defense [counsel]."

On appeal, Duran-Gomez argues that the 2017 discovery disclosure contributed to the deprivation of his speedy trial right and that the delay should weigh against the government.  He implies that the government should have explained exactly how an open file policy worked.  He also says that his counsel was under the impression that the government would let them know every time new discovery became available.

This argument is unpersuasive for several reasons.  First, the government's open file policy in this case complied with the plain words of Federal Rule of Criminal Procedure 16(a)(1)(B): "Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing" certain discovery materials.  In fact, the open file policy in this case apparently went above and beyond the requirements of Rule 16 because, before the 2017 disclosure, Duran-Gomez had not "requested" many of the discovery materials that could be made available to him under Rule 16(a)(1).  And yet the government made them available anyway.

No. 20-20147

Second, the government's e-mailing defense counsel twice to let them know that CDs were available for pickup does not invalidate its otherwise legitimate open file policy—nor does it prove that the parties had an understanding that the government would do that *every time* new materials became available.

Third, as to Duran-Gomez's argument that the government should have explained how the open file policy worked, we cannot say that any delay arising from the 2017 disclosure should weigh heavily against the government—especially in light of the fact that Duran-Gomez mentioned needing time to process discovery in only one of his two motions for continuance he made *after* the government handed over the 65,000 pages. The motion that mentioned discovery did not relate to production delay but instead related to his new counsels' need to "familiarize themselves with the large volume of materials in this case"—despite two other lawyers already being on Duran-Gomez's defense team.

In this case, Duran-Gomez contributed substantially to the delay. He requested a slew of continuances. He represented that he needed those continuances to investigate the issues, prepare his defense and mitigation, attempt to make a plea deal with the government, and "wait and see" if his co-defendants could serve a helpful purpose in his own defense. In light of the specific facts and circumstances of this case, we hold that the second *Barker* factor weighs heavily against Duran-Gomez.

## C.

Next, we consider the third factor, which is the defendant's diligence in asserting his right to a speedy trial. *Barker*, 407 U.S. at 531. The Supreme Court noted in *Barker* that "[t]he more serious the deprivation, the more likely a defendant is to complain." *Id.* Hence, whether a defendant has asserted (or failed to assert) his right "is entitled to strong evidentiary

14

weight" in our analysis. *Id.* "We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532.

An assertion of the right to a speedy trial is a "demand for a speedy trial." *United States v. Frye*, 489 F.3d 201, 211 (5th Cir. 2007). We have held that this will "generally be an objection to a continuance or a motion asking to go to trial." *Id.* "At the very least," a defendant "should manifest 'his desire to be tried promptly.'" *Id.* at 211–12 (quoting *United States v. Litton Sys., Inc.*, 722 F.2d 264, 271 (5th Cir. 1984)). If a defendant waits too long to assert his right, his "silence will be weighed against him." *United States v. Parker*, 505 F.3d 323, 329–30 (5th Cir. 2007).

In this case, Duran-Gomez concedes that he never objected to a continuance or specifically asked to go to trial, which were the two examples of assertion given in *Frye*, 489 F.3d at 211. Instead, he calls our attention to two occurrences that, he says, manifested his desire for a speedy trial. *See id.* at 212.

Duran-Gomez notes that he made a motion in April 2012 asking the district court to set a deadline for the government to file its Notice of Intent to seek the death penalty against him. He also calls our attention to an exchange that his counsel had with the district court during an October 2012 status conference. At this status conference, after Duran-Gomez's counsel indicated that he would be filing some kind of pre-trial motions, the district court asked: "Are we talking about motions dealing with, for example . . . the question of whether or not the defendant can get a fair trial based upon the length of time?" Duran-Gomez's counsel responded, "Yes, Judge."

Neither of these occurrences can fairly be described as an assertion of the speedy trial right. If anything, they qualify only as informal awareness of the right to a speedy trial, which does not meet the burden. *See Frye*, 372 F.3d

at 739 ("The discussion and awareness of the right is not the relevant factor; the relevant factor is when and how a trial request is made to the court."). A two-word affirmative answer to the district court's question about "motions dealing with . . . a fair trial based upon the length of time" is not within the same ballpark as "an objection to a continuance or a motion asking to go to trial." *Frye*, 489 F.3d at 211. Moreover, Duran-Gomez did not file any such motion or move for dismissal on speedy trial grounds until seven years after this status conference. His silence weighs against him. *See Parker*, 505 F.3d at 329–30. For similar reason, his request for a death-penalty deadline fails to qualify as an assertion of the right. Whether the government would seek his death is only one aspect; he did not ask the district court to set a deadline for his trial.

Duran-Gomez moved to continue the trial ten times and he explicitly consented to other parties' motions for continuance on seven occasions. After all, it was Duran-Gomez who, in May 2019, suggested continuing the trial from January 2020 to January 2022. Just a few months after that suggestion, he said his right to a speedy trial had been violated and moved to dismiss all charges against him. As the *Frye* court wisely remarked: "It can hardly be said that" a defendant's many motions for continuance represent someone "aggressively asserting his desire to be tried promptly." *Frye*, 489 F.3d at 212. This factor weighs heavily against Duran-Gomez.

## D.

*Barker*'s fourth and final factor is prejudice suffered by the defendant as a result of the delay. The burden is ordinarily on the defendant to demonstrate actual prejudice, but there is a scenario in which prejudice can be presumed. We will analyze Duran-Gomez's presumed-prejudice argument, then look to actual prejudice.

No. 20-20147

Duran-Gomez argues that prejudice should be presumed. We have previously held that delay longer than five years gave rise to the presumption of prejudice, when at least five years of the case's total delay is due to the government's negligence or bad faith and the defendant asserted his speedy trial right. *See, e.g.*, *United States v. Cardona*, 302 F.3d 494, 498 (5th Cir. 2002) ("Cardona's assertion of the speedy trial right and the unreasonable five-year delay weigh heavily in Cardona's favor").[9] Accordingly, prejudice can be presumed when a court finds that the first three *Barker* factors weigh heavily against the government. *United States v. Serna-Villarreal*, 352 F.3d 225, 231 (5th Cir. 2003). *See also Molina-Solorio*, 577 F.3d at 305–07 (analyzing each of the first three *Barker* factors even though the length of delay was "nearly ten years" because prejudice can be presumed "where the first three factors together weigh heavily in the defendant's favor"); *Cardona*, 302 F.3d at 498 ("Under *Doggett* and *Bergfeld*, the first three factors 'should be used to determine whether the defendant bears the burden to put forth specific evidence of prejudice (or whether it is presumed).'" (quoting *United States v. Bergfeld*, 280 F.3d 486, 490 (5th Cir. 2002)).

Even when prejudice is presumed, however, our inquiry is not over. The Supreme Court held in *Doggett v. United States* that "presumptive prejudice cannot *alone* carry a Sixth Amendment claim without regard to the other *Barker* criteria." 505 U.S. 647, 656 (1992) (emphasis added). The government can also rebut the presumption by proving that the prejudice is

---

[9] *See also United States v. Bergfeld*, 280 F.3d 486, 491 (5th Cir. 2002) ("[T]he five-year delay in the present case caused by the government's negligence entitles Bergfeld to a presumption of prejudice."); *United States v. Serna-Villarreal*, 352 F.3d 225, 233 n.5 (5th Cir. 2003) ("The portion of the post-indictment delay attributable to government negligence in *Doggett*, *Bergfeld*, and *Cardona*, was six years, five years, and five years, respectively.").

"extenuated by the defendant's acquiescence." *Cardona*, 302 F.3d at 499; *see also Doggett*, 505 U.S. at 658.

The first three *Barker* factors do not weigh heavily against the government, so prejudice against Duran-Gomez is not presumed under the *Serna-Villarreal* framework. *Serna-Villarreal*, 352 F.3d at 231. While the length of delay weighs heavily against the government, the second and third factors weigh heavily against Duran-Gomez.

Even if we were to accept Duran-Gomez's argument that prejudice should be presumed, with the "other *Barker* criteria" in mind, we conclude that the government has "persuasively rebutted" any purported presumed prejudice in this case. *Doggett*, 505 U.S. at 656, 658. With his many motions for continuance, Duran-Gomez acquiesced in and indeed actively sought the delay about which he now complains. In addition, "the amount of time that lapsed before" Duran-Gomez "made a formal request based on his speedy trial right cuts against presuming prejudice." *Frye*, 372 F.3d at 739. Any presumed prejudice was heavily extenuated and we therefore reject Duran-Gomez's presumed-prejudice argument.

In the alternative, Duran-Gomez says he suffered actual prejudice, which he bears the burden of showing. *See Serna-Villarreal*, 352 F.3d at 230. "Actual prejudice is assessed in light of the three following interests of the defendant: (1) to prevent oppressive pre-trial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." *United States v. Harris*, 566 F.3d 422, 433 (5th Cir. 2009) (internal quotations omitted).

Of these interests, "[t]he Supreme Court has stated that limiting the defendant's ability to prepare his case is the most serious." *Frye*, 489 F.3d at 212 (citing *Barker*, 407 U.S. at 532). Before trial, a claim of an impaired defense "tends to be speculative." *United States v. MacDonald*, 435 U.S. 850,

858 (1978).  After all, it is only after trial that a reviewing court is able to evaluate any impairment the defendant may have *actually* suffered.  Based on these principles, we disfavor a defendant's conclusory and unsupported assertions of actual prejudice. *Frye*, 489 F.3d at 213.

Duran-Gomez argues that he has suffered oppressive pre-trial incarceration and anxiety and concern.  He also says that his defense has been impaired because the government has not yet provided contact information for several potential, deported witnesses.  As we have already acknowledged, Duran-Gomez substantially contributed to the pre-trial delay with his many motions for continuance.  His failure to object to a single motion for continuance also undercuts any assertion of anxiety or concern, as does his failure to provide any evidence in support of his argument. *See id.*  Duran-Gomez's defense-impairment argument is weak, as a defendant's current inability to contact someone is the type of "speculative" argument we are wary of in pre-trial, Sixth Amendment cases. *See MacDonald*, 435 U.S. at 858; *see also United States v. Crouch*, 84 F.3d 1497, 1515–16 (5th Cir. 1996).  Furthermore, Duran-Gomez admitted in his brief that his counsel from his obstruction of justice case deposed some of the witnesses he says he now cannot contact.  Duran-Gomez has failed to prove that he suffered actual prejudice.

## IV.

Balancing the *Barker* factors, we hold that Duran-Gomez's right to a speedy trial has not been violated.  As for the length of delay, the government alleges that he ran an international, multi-year human-smuggling operation.  During that illegal activity, he allegedly killed two men and committed several capital crimes.  Duran-Gomez was originally charged alongside five co-defendants, two of whom were potential capital defendants like Duran-Gomez.  While we weigh *Barker*'s first factor against the government, we

recall the Supreme Court's note that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531.

Duran-Gomez contributed substantially to *Barker*'s second factor, the reason for delay. While the government's death-penalty review process with respect to Rodriguez-Mendoza took a substantial period of time, we cannot say that this should weigh against the government in the specific circumstances of this case. Furthermore, the government's open file policy complied with Federal Rule of Criminal Procedure 16. Duran-Gomez sought myriad continuances and never objected to another party's motion for continuance. In his motions for delay, he said that he needed more time to investigate the issues, interview witnesses, and negotiate a possible plea deal with the government. This factor weighs heavily against Duran-Gomez.

*Barker*'s third factor also weighs heavily against Duran-Gomez because the Supreme Court has "emphasize[d]" that it will be "difficult" for a defendant to prove a speedy-trial violation when he fails to diligently assert his right. *Barker*, 407 U.S. at 532. Duran-Gomez did not assert his speedy trial right for over nine years, until he moved to dismiss the indictment on speedy trial grounds in August 2019. The two instances in which Duran-Gomez's counsel indirectly mentioned the length of delay before August 2019 do not qualify as assertions under our precedent. *Frye*, 489 F.3d at 211.

Finally, as for *Barker*'s fourth factor, prejudice may not be presumed because "the first three factors together [do not] weigh heavily" in Duran-Gomez's favor. *Molina-Solorio*, 577 F.3d at 307. Even if prejudice were to be presumed, it was substantially extenuated by Duran-Gomez's actions. *Cardona*, 302 F.3d at 497. He also failed to carry his burden of proving that he suffered actual prejudice under *Harris*, 566 F.3d at 433.

Simply put, "the record strongly suggests" that Duran-Gomez—while hoping "to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges"—"definitely did not want to be tried." *Barker*, 407 U.S. at 535.

## V.

The district court held that Duran-Gomez's Fifth Amendment due-process rights had been violated in the pre-indictment period.  On appeal, however, Duran-Gomez conceded in his brief and at oral argument that we need not address any issues related to the Due Process Clause, because he did not seek dismissal on Fifth Amendment grounds.  Oral Argument at 27:34-28:04.  In any event, Duran-Gomez did not suffer a Fifth Amendment due-process violation because he failed to prove that the government acted in bad faith and caused him actual, substantial prejudice during the pre-indictment period, and we REVERSE the district court's alternative holding. *See Crouch*, 84 F.3d at 1514; *United States v. Gulley*, 526 F.3d 809, 820 (5th Cir. 2008).

\*     \*     \*

The judgment of the district court is REVERSED and the case is REMANDED for a prompt trial.