# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 6, 2022

Lyle W. Cayce
Clerk

No. 21-50915

United States of America,

*Plaintiff—Appellee*,

*versus*

Mehrdad Ansari,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:11-CR-516-3

Before King, Duncan, and Engelhardt, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

At a federal jury trial in the midst of the COVID-19 pandemic, Mehrdad Ansari was convicted on all five remaining[1] counts of a 2011 indictment charging himself and two co-conspirators with a variety of offenses arising from a well-orchestrated scheme to circumvent American export controls designed to prevent dual use commodities—goods with both civilian and military applications—from falling into the hands of adversaries

---

[1] The Government voluntarily dismissed two additional charges to secure Ansari's extradition by the Republic of Georgia.

No. 21-50915

like Iran. In September 2021, the district court sentenced Ansari to 123 months' imprisonment and three years of supervised release.

On appeal, Ansari seeks reversal and remand on three independent grounds. First, he argues that the district court's refusal to dismiss his nearly decade-old indictment violated his Sixth Amendment right to a speedy trial. Second, he contends that the district court's COVID-motivated restrictions on his jury trial violated his Sixth Amendment right to a public trial. Lastly, he maintains that whatever the outcome of his constitutional arguments, the evidence for each of the five counts for which he was convicted is insufficient to support the jury's verdict. We address each of these arguments in turn, and ultimately AFFIRM.

I

Ansari first takes issue with the lengthy time between his indictment (in 2011) and his trial (in 2021). Ansari lays blame for such delay solely at the feet of the Government, which, he contends, both slow-walked his case to prioritize its pursuit of "bigger fish to fry" *and* negligently bungled its efforts to secure his apprehension. In doing so, he recasts speedy trial arguments the district court rejected in a thorough order denying his motion to dismiss his indictment on the same grounds. Reviewing the district court's application of the correct legal test de novo and its factual findings in performing that application for clear error, *United States v. Duran-Gomez*, 984 F.3d 366, 373 (5th Cir. 2020), we too find Ansari's speedy trial claim unavailing.

A

The Sixth Amendment affords "the accused" "the right to a speedy . . . trial." U.S. CONST. amend. VI. Because no two cases are the same and because "the ordinary procedures for criminal prosecution are designed to move at a deliberate pace," the "right of a speedy trial is necessarily relative" and circumstance-specific. *United States v. Ewell*, 383

2

No. 21-50915

U.S. 116, 120 (1966). In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court set forth a classic balancing test for determining whether a delay by the Government in bringing a defendant's case to trial violates the Sixth Amendment's speedy trial guarantee. *Barker* requires a balancing of four factors: (1) the length of any delay, (2) the reason for such delay, (3) the defendant's diligence in asserting the right, and (4) the delay's prejudice—if any—to the defendant. *Id.* at 530. "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.* at 533. As such, no factor is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id.* Instead, all factors are related "and must be considered together with such other circumstances as may be relevant." *Id.* This classically pliable standard "recognize[s] that pretrial delay is often both inevitable and wholly justifiable," as when, for one particularly pertinent example, the defendant "goes into hiding" and the Government "need[s] time" to "track him down." *Doggett v. United States*, 505 U.S. 647, 656 (1992).

*Barker* frames our analysis here. "*Barker*'s first factor, length of delay, functions as a triggering mechanism." *Duran-Gomez*, 984 F.3d at 374 (citing *Barker*, 407 U.S. at 530). "In our circuit, we examine the remaining three factors if the trial has been delayed for at least one year." *Id.* (citing *Goodrum v. Quarterman*, 547 F.3d 249, 257–58 (5th Cir. 2008)). Here, there is no question that the delay at issue requires an analysis of the three remaining *Barker* factors—Ansari was indicted in 2011, arrested in 2019, extradited in 2020, and tried in 2021.

The district court correctly conducted a full *Barker* analysis in denying Ansari's motion to dismiss on speedy trial grounds. We agree for the simple reason that the Government was not at fault in producing the delay Ansari now complains of. To the contrary, Ansari's own evasive efforts were the

principal cause of the delay, and regardless, Ansari was neither diligent in asserting his speedy trial right nor prejudiced by the delay in this case.

1

Ansari's speedy trial claim hinges on the latter three of *Barker*'s four prongs. We'll naturally begin with the first such prong—reason for delay. But, first, some important background.

Ansari's young-and-promising career as a Dubai-based freight forwarder took a turn for the worse when he chose to work with two co-conspirators to smuggle microwave absorbers with potentially dangerous military applications into Iran. As the Government detailed at trial and in its brief here, Ansari was engaged by his co-conspirators as something of a "middle man" for the surreptitious forwarding of the absorbers from Taiwan (a country to which they *could* be exported without American approval) to Iran (anything but). In sum, Ansari and his co-conspirators attempted to ship 105,992 parts valued collectively at $2.63 million. Had the deal succeeded, Iran could have used the parts for "nuclear weaponry, missile guidance and development, secure tactical radio communication, offensive electronic warfare, military electronic countermeasures (radio jamming), and radar warning and surveillance systems." After snuffing out this illegal plot, the Government indicted each of the conspirators in 2011. It contends that it "employed every viable means to capture" Ansari from that point forward.

All the while, Ansari's name may have just been an alias under which he was choosing to conduct his criminal affairs. Indeed, it remains unclear, even after oral argument, what Ansari's actual name is or how many names he might have used. Two critical facts are certain on our clear-error review, however—the district court found that Ansari *did* take a post-indictment trip to the United States under a different name (*Moien*ansari), and *did* misstate on his visa application for the same trip that he did not use any other names.

No. 21-50915

These facts are telling, for by using a name other than the "Ansari" name government investigators knew and wanted him by, Ansari evaded apprehension on that 2012 trip and never again returned to America before his extradition. Ansari's ability to dodge authorities on this post-indictment trip is without doubt the most fateful episode in his lengthy prosecutorial saga and the chief cause of the delay with which he now perversely takes issue.

The district court found essentially just that, observing "that many periods of time [between Ansari's indictment and his trial] (about four years) were not attributable to the Government," and, most importantly, that Ansari himself caused a large part of the delay when he evaded apprehension in his 2012 trip to the United States by "with[holding] his full name from authorities, including misstating on his visa application that he did not use any other names." When combined with the inherent difficulty of capturing a foreign national wanted for conspiracy to illegally benefit a malign foreign regime, Ansari's deliberate misstatements and use of an alias throughout the conspiracy lend substantial credence to the district court's determination that most (if not all) of the blame for the delay in bringing Ansari to trial belonged to Ansari himself.

As important—since a major purpose of the Sixth Amendment's speedy trial guarantee is to curb prosecutorial gamesmanship[2]—the record reveals no shortage of diligence on the Government's part. As soon as reasonably possible, the Government entered the name Ansari was using to conduct his conspiracy-related business—"Mehrdad Ansari"—into a case management system it uses to detect air travel to and from the United States.

---

[2] *See, e.g.*, *Barker*, 407 U.S. at 531 n.32 ("We have indicated on previous occasions that it is improper for the prosecution intentionally to delay 'to gain some tactical advantage over (defendants) or to harass them.'" (alteration in original) (quoting *United States v. Marion*, 404 U.S. 307, 325 (1971))).

No. 21-50915

As previously noted, it was initially unaware of the mismatch between Ansari's "passport" name and his "conspiracy" name, but promptly entered the later-learned name into systems designed to secure Ansari's apprehension after discovering a visa application displaying the "Moeinansari" name beside Ansari's picture.

The Government's efforts did not end there. It attempted a sting operation to nab Ansari by luring him back to the United States (which actually did work on one of his co-conspirators). It indicted his co-conspirators. It publicized his indictment—after it was initially sealed—to invite him to turn himself in for trial. It worked with Interpol and foreign nations to the greatest feasible extent. And it even dropped charges it had brought against Ansari to secure his extradition at the first opportunity to do so. In short, it can credibly claim to have "diligently used every practical and lawful method to arrest [Ansari] as quickly as possible."

Ansari does not dispute these facts but instead argues that the Government was negligent in its aforementioned efforts to detain him. That notion falls flat, though. As noted above, the speedy trial inquiry is intensely case-specific. In this case, the Government shows good cause for each of the delays Ansari highlights, and accordingly, that it acted reasonably throughout the course of this case. Ansari specifically argues that he "traveled on business throughout Europe and to the United States always using his company address and email address," but the Government shows that he acted under an alias in furtherance of the conspiracy at issue. Ansari argues that the Government waited too long to contact the HSI Attaché[3] in Dubai—

_____

[3] "[Homeland Security Investigations] Attachés collaborate with host nation law enforcement, customs, and immigration counterparts to further the transnational criminal investigations being conducted by domestic HSI field offices and likewise refer investigative requests from foreign counterparts to domestic HSI field offices." U.S. Embassy in Cambodia, Department of Homeland Security

which may have led to the Government's discovery of his alternative identit(ies)—but the Government understandably counters that doing so any sooner might have "disrupt[ed] the ongoing investigation" because the "UAE serves as a transshipment point for sensitive dual-use and military items destined for Iran and [because] the two countries maintain close economic and political ties." Ansari takes issue with the Government's six-year delay "before approaching INTERPOL for a diffusion during which time [Ansari] traveled openly to countries with extradition treaties with the United States," but this pays no mind to the Government's well-founded belief that Ansari resided in countries (the UAE and Iran) not parties to extradition treaties with the United States, which reasonably led the Government to believe that an Interpol diffusion notice would be futile and/or counterproductive. Lastly, Ansari argues that the Government should have taken additional measures to contact him regarding his indictment, but this both ignores the fact that the Government *did* take steps to put Ansari on reasonable notice of his indictment—by unsealing the indictment, issuing a press release, and placing Ansari and his companies on the Commerce Department's Entities List—and is belied by the fact that Ansari appears to have been taking active steps to *avoid* apprehension all along. Each of these facts was baked in to the district court's bottom-line fact finding that Ansari was primarily responsible for the Government's prolonged failure to bring him to trial, and Ansari fails to show how that finding was clearly erroneous.[4]

---

(DHS)/Homeland    Security    Investigations    (HSI), https://kh.usembassy.gov/embassy/phnom-penh/sections-offices/dhs/.

[4] Recall, importantly, that the district court's fact findings in this regard can only be overturned for clear error, which requires "a definite and firm conviction that a mistake has been committed." *Duran-Gomez*, 984 F.3d at 373 (quoting *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010)). The record on appeal makes no such impression.

No. 21-50915

Because of the Government's diligence and Ansari's evasiveness, the first two factors in the *Barker* balancing test weigh decidedly against Ansari's speedy trial claim. Indeed, as far as Ansari's speedy trial right is concerned, the lengthy delay between his indictment and his conviction is all smoke and no fire. This case is worlds apart from the paradigmatic speedy trial case in which a defendant's Sixth Amendment right is violated by the Government's "deliberate attempt to delay the trial in order to hamper the defense" or in which a defendant is kept in custody or legal limbo for an undue length of time as an inappropriate form of punishment. *See generally Barker*, 407 U.S. at 531.

In sum, this is a case where a defendant who took steps to avoid being caught now faults the Government for not catching him sooner. That hardly warrants Sixth Amendment sympathies.

2

Ansari's efforts to avoid apprehension cut against his speedy trial assertion in another way, as well—they betray a lack of diligence in asserting the right. As noted, the Government took several affirmative steps to put Ansari on notice of his indictment. But instead of turning himself in for a prompt trial, Ansari deliberately evaded authorities, resisted extradition seven-plus years into the case against him, and used a misleading name in the fateful 2012 trip to the United States that would, perhaps tellingly, be his last time visiting America before his extradition. This lack of diligence in asserting the right further undermines Ansari's speedy trial claim. *See id.* at 530.

3

Ansari's inability to show prejudice by the supposed violation of his speedy trial right is "extra icing on a cake already frosted." *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting).

No. 21-50915

When conducting a *Barker* analysis, "[t]he court can presume prejudice if the first three factors weigh heavily in the defendant's favor; if they do not, the defendant must show actual prejudice." *United States v. Rojas*, 812 F.3d 382, 410 (5th Cir. 2016). Here, the second and third factors weigh heavily *against* Ansari, so his failure to show any concrete prejudice whatsoever is another severe weakness. Indeed, Ansari fails to allege virtually any prejudice to "the interests of defendants which the speedy trial right was designed to protect": namely, (1) prevention of "oppressive pretrial incarceration," (2) minimization of "anxiety and concern of the accused," and (3) limitation of "the possibility that the defense will be impaired."[5] *Barker*, 407 U.S. at 532. Instead, Ansari rehashes the same arguments and facts that failed him on the first three prongs in a question-begging assertion that prejudice must be presumed since the first three *Barker* factors weigh so heavily in his favor. As explained above, that is simply not so.

\*     \*     \*

Because the *Barker* balancing test weighs overwhelmingly against Ansari, the district court was correct to deny his motion to dismiss for lack of speedy trial.

## II

Ansari's attempt to reverse the jury's verdict on *public* trial grounds is even more ambitious. Ansari nitpicks nearly every aspect of the district court's COVID-driven decision to restrict the public to an overflow room featuring a contemporaneous live audio and video stream of his May 2021

---

[5] At oral argument, Ansari's counsel blankly contended that the delay hampered Ansari's defense by diminishing his access to favorable emails. Neither there nor in his brief did he provide any specifics.

No. 21-50915

trial.[6] But because the Sixth Amendment requires only a substantial reason for a courtroom's partial[7] closure—and because it does *not* impose the science project Ansari would have the panel grade the district court on[8]—we reject this argument as well.

## A

The Sixth Amendment also guarantees criminal defendants the right to a public trial. *See* U.S. CONST. amend. VI; *United States v. Cervantes*, 706 F.3d 603, 611 (5th Cir. 2013). By encouraging witnesses to come forward, discouraging perjury, and enabling the attendance of interested spectators, a public trial advances what the Supreme Court has termed the "central aim

---

[6] *See* Opening Br. at 4–5 ("The findings of the district judge in the case at bar were broad and general and did not justify the closure of the courtroom from the public. The judge generally referenced COVID restrictions and the need for distancing, but the judge did not state any official protocol regarding how far people should be distanced based on COVID restrictions, if any, that were in effect on the date of the Appellant's trial. The judge did not relate the measure of alleged COVID distancing to the large spectator area of the courtroom and calculate how many people could be safely seated in the spectator area. The judge did not consider the use of a larger courtroom rather than the courtroom used for the Appellant's trial. The district judge made no findings supporting its conclusion that an open proceeding would threaten the safety interests of the trial participants with respect to COVID. Even if findings would have supported closure of the courtroom, the district judge failed to consider whether alternatives were available to protect the safety interests of trial participants. Even if the district judge was correct in concluding that COVID safety concerns were concrete enough to warrant closing the courtroom, the particular interest, and threat to that interest, was not articulated along with findings specific enough that a reviewing court may determine whether the closure order was promptly entered. The district judge was required to consider alternatives to closure even when not offered by the parties. The district judge failed to consider whether alternatives were available to protect the trial participants from COVID.").

[7] Ansari's contention at oral argument that the courtroom closure was *total* is puzzling and belied by the record. Because any member of the public could fully access the trial by livestream in an overflow room down the hall, we deem the closure in this case a partial one and analyze the issue accordingly.

[8] *See supra* note 6.

of a criminal proceeding": trying the accused fairly. *Waller v. Georgia*, 467 U.S. 39, 46 (1984); *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979). Even so, the right to a public trial "is not absolute" and must be "balanced against other interests essential to the administration of justice." *United States v. Osborne*, 68 F.3d 94, 98 (5th Cir. 1995) (citing *Waller*, 467 U.S. at 45). We have held that the constitutionality of a district court's partial closure of a courtroom during a criminal trial is a legal question reviewed de novo on which we'll affirm "so long as the [district] court had a 'substantial reason' for partially closing [the] proceeding." *Cervantes*, 706 F.3d at 611–12 (quoting *Osborne*, 68 F.3d at 98–99).

One interest in partially closing a courtroom, and the one the district court validly claimed in doing so here, may be protecting jurors, witnesses, parties, court personnel, and spectators from exposure to communicable disease. As is now readily familiar, COVID-19 spreads primarily between individuals in close indoor contact. In recognition of this obvious point of common sense—and likely in some degree of deference to the slew of guidelines and regulations that continued to be a ubiquitous fact of American life well into 2021—the district court made an eminently reasonable "attempt . . . at trying to maintain social distancing for [the jury, which could not 'socially distance' sufficiently in the courtroom's ordinary jury box]" by directing an "audio and video feed down to the jury assembly area to allow for any spectators, press, or anyone else who wishes to view this trial." (Quoting district judge's oral statements on the record.)

This reasonable and exceedingly nonintrusive means of balancing Ansari's right to a prompt public trial with the countervailing need to conduct the trial in a COVID-sensitive manner[9] is simply not

---

[9] As it pertains to the reasonableness of the district court's balancing here, the district court should perhaps be credited for holding any jury trial *at all* in May of 2021, as

No. 21-50915

unconstitutional. Indeed, the very need to perform such a balancing act is "substantial reason" enough for the modest and partial courtroom closure Ansari complains of. *See Cervantes*, 706 F.3d at 611–12 ("When a criminal proceeding is only partially closed, the court must 'look to the particular circumstances of the case to see if the defendant will still receive the safeguards of the public trial guarantee.' . . . [T]he Court will affirm so long as the lower court had a 'substantial reason' for partially closing [the] proceeding." (quoting *Osborne*, 68 F.3d at 98–99)). This "substantial reason" requirement imposes a low bar, and the district court plainly cleared it here.[10]

*        *        *

Because the Sixth Amendment does not require a district court to render a particularized dissertation to justify a partial courtroom closure that is reasonable, neutral, and largely trivial (i.e., requiring spectators to watch and listen on livestream rather than in-person), the district court's partial closure of Ansari's jury trial was not unconstitutional.

---

well as for granting Ansari's request that his trial be moved to an earlier date on the calendar. One alternative—and one that all too many district courts were still embracing in 2021—would have been a loosely framed continuance to some "safer" date in the future. *See, e.g.*, *As Covid-19 Cases Fall, Juries Get Back to Work*, U.S. Cts. (May 27, 2021), https://www.uscourts.gov/news/2021/05/27/covid-19-cases-fall-juries-get-back-work ("Even in districts where COVID numbers are falling most rapidly, some judges are reporting they still must overcome challenges to stage trials.").

[10] That is not to say that all partial closures for "social-distancing" purposes will inevitably be reasonable and constitutionally sustainable forevermore. The Constitution takes no backseat in times of crisis. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020) (Gorsuch, J., concurring). It thus bears repeating that the Sixth Amendment courtroom-closure analysis is intensely case-specific. What this panel has deemed reasonable for this trial in May of 2021 may be patently unreasonable in May of *2023*.

No. 21-50915

III

That leaves Ansari's factual arguments against his conviction. Here again, the applicable legal standards impose a tall order that Ansari fails to satisfy. As we briefly recap below, Ansari's factual arguments are each refutable by evidence the Government presented. As a result, we affirm the verdict the jury rendered upon a firsthand review of Ansari's role in the conspiracy at issue.

A

Ansari challenges the evidentiary sufficiency for his five convictions. "In a sufficiency challenge, the question is not 'whether [this court] believes that the evidence at the trial established guilt beyond a reasonable doubt.' Rather, the familiar test is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. del Carpio Frescas*, 932 F.3d 324, 328 (5th Cir. 2019) (per curiam) (alteration in original) (citation omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).

Here, the jury convicted Ansari on each of the following five charges: Count One, Conspiracy to Violate the International Emergency Economic Powers Act (IEEPA) and the Iranian Transaction Regulations; Count Two, Conspiracy to Commit Wire Fraud; Count Four, Conspiracy to Defraud the United States; and Counts Six and Seven, Aiding and Abetting the Making or Use of a False Writing. Especially when viewed in the light most favorable to the Government, a rational trier of fact could certainly find the essential elements of each of these crimes—which Ansari does not contest as a legal matter—beyond a reasonable doubt. *Cf. id.* At bottom, evidence at trial established that Ansari played a distinctive "middle man" role in knowingly

flouting American export restrictions by lying about the true destination of the weapons-grade microwave absorbers at issue.

Beginning with Count One (Conspiracy to Violate the IEEPA and Iranian Transaction Regulations), the Government provided abundant evidence of Ansari's guilt. *See* 50 U.S.C. § 1705; 31 C.F.R. § 560. As to the conspiracy prong, the evidence establishes (1) an agreement between Ansari and co-conspirators Susan Yip and Mehrdad Foomanie to (2) pursue the unlawful purpose of smuggling prohibited goods into the embargoed nation of Iran, and (3) *several* overt acts in furtherance of that agreement. One particularly vivid example is Yip's emailing Ansari: "I told my USA vendor that this cargo will send to Taiwan, never mention about IRAN or UAE. I hope you can aware of this matter and don't give wrong information to my USA vendor, otherwise, your any mistake will make us in trouble [sic]." As to the underlying crime, the evidence likewise establishes that Ansari willfully attempted to facilitate the export of U.S.-origin dual use commodities into Iran without required authorizations. The record shows, for example, that Ansari lied to third parties about the prohibited goods' prohibited destination.

The same is true of Count Two (Conspiracy to Commit Wire Fraud). The wire fraud statute criminalizes—as relevant here—the "transmi[ssion] by any means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing" a "scheme or artifice to defraud." *See* 18 U.S.C. § 1343. By their several interstate communications in furtherance of a scheme to defraud multiple third parties here, the defendants violated this statute in spades. For the same reason, the same goes for Count Four (Conspiracy to Defraud the United States). *See* 18 U.S.C. § 371 ("If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons

do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.").

Ansari's convictions on Counts Six and Seven (Aiding and Abetting the Making or Use of a False Writing) are irreversible as well. At Ansari's behest, Yip intentionally misinformed a federal agent in a March 25, 2008 email that the end-user of the microwave absorbers at issue was a company in Taiwan when she and Ansari knew full well that the goods were really headed for Iran. Two days later, Ansari repeated the same lie in a follow-up email to the same agent. The record gives no reason to doubt the authenticity or upshot of these false writings.

Ansari's counterargument centers on two pieces of evidence: first, his supposed refusal to lie to the seller of the microwave absorbers that the items would not be shipped to the "Middle East," and second, his total lack of involvement with all but one of the objects of the conspiracy listed in the indictment. Ansari's second objection raises a distinction without a difference. Indeed, Ansari's noninvolvement in transporting indictment "items 10(b)-(q)" has nothing to do with his involvement in transporting indictment "item 10(a)" (the microwave absorbers in question), which the Government proved beyond a reasonable doubt and which alone is a sufficient predicate for each of the five charges on which Ansari was convicted.

Ansari's first objection meets the same fate. To be sure, the record does describe a dispute among the conspirators as to whether Ansari erred in informing a third-party shipper that the goods in question would indeed be shipped to the "Middle East." Ansari argues that his defiance of Yip and Foomanie's instructions to lie on this point both tipped authorities off to the illegal scheme and absolved him of any involvement in the shipment by precipitating his "firing" as Yip and Foomanie's "powerful forwarder"

before the goods were actually shipped. But this is belied by both the record and the law. For one, whether Ansari had a "falling out" from the conspiracy before it achieved its desired end makes not a bit of legal difference, as all that's required for conspiracy liability is an *agreement* to do something illegal and one act in furtherance of that agreement. As described above, this case clearly fits that billing. Likewise, Ansari's refusal to lie to the seller of the goods in no way absolves him of the lies he *did* tell to a federal agent inquiring about the sale—or any of the other misstatements he and his co-conspirators made in furtherance of the fraudulent scheme at the heart of this case.

Particularly when viewed in the light most favorable to the prosecution, the evidence the Government exhaustively recounts in its brief is more than sufficient to support the jury's verdict on all five charges against Ansari. Because a rational trier of fact could indeed find the essential elements of Ansari's crimes beyond a reasonable doubt, *see Jackson*, 443 U.S. at 319, his evidentiary-sufficiency challenge is unavailing.

*    *    *

Ansari's conviction and sentence are therefore AFFIRMED.